UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THE DIAZ FRITZ GROUP, INC.,

    Plaintiff,

v.                    Case No. 8:20-cv-785-VMC-AAS

WESTFIELD INSURANCE COMPANY,

    Defendant.

_____/

**ORDER**

    This matter comes before the Court pursuant to Plaintiff Diaz Fritz Group, Inc.'s Motion for Partial Summary Judgment (Doc. # 47) and Defendant Westfield Insurance Company's Motion for Summary Judgment (Doc. # 48), filed on January 22, 2021. For the reasons discussed below, Diaz Fritz's Motion is denied and Westfield's Motion is granted.

**I.   Background**

    **A.   The Insurance Policy**

    The following facts are undisputed. Plaintiff Diaz Fritz Group, Inc. is a general contractor in the state of Florida. (Doc. # 1-1 at 16).  Effective from January 1, 2009 through January 1, 2010, Diaz Fritz purchased a general liability insurance policy ("the policy") from Defendant Westfield

Insurance Company. (Id. at 16, 71).  In relevant part, the policy provided the following coverage:

> a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages . . .
>
> b.  This insurance applies to "bodily injury" and "property damage" only if:
>
> > (1)  The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;"
> >
> > (2)  The "bodily injury" or "property damage" occurs during the policy period[.]

(Id. at 97).

The policy defined an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Id. at 110). "Property damage" was:

> a.  Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b.  Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(Id.).

Under the policy, a "suit" was defined as "a civil proceeding in which damages because of 'bodily injury', 'property damage' or 'personal and advertising injury' to which this insurance applies are alleged." (Id. at 111). This included:

    a.  An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

    b.  Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

(Id.).

### B.   The Underlying Litigation

In 2011, Diaz Fritz initiated suit in Florida state court against non-party Hayward Baker, Inc. ("the underlying litigation"). (Doc. # 47-1). The operative complaint in that suit alleged that in May 2009, Diaz Fritz entered into a subcontract with Hayward to perform foundation work at University Community Hospital Carrollwood ("the hospital"). (Id. at ¶¶ 6-7).

While executing the subcontract, Hayward allegedly caused flooding in one of the hospital's building. (Id. at ¶ 8). Diaz Fritz eventually paid the hospital for the restoration and remediation of the damaged property. (Id. at

¶ 9). Diaz Fritz claimed that the flooding was the result of "defective work," therefore Hayward breached the subcontract and was liable to Diaz Fritz for all costs paid to the hospital. (Id.).

Hayward filed an answer to the complaint containing several affirmative defenses. (Doc. # 48-4). In the third affirmative defense, Hayward stated:

> [Diaz Fritz's] claims are barred because any alleged damages to [Diaz Fritz] and [the hospital] were caused, in whole or in part, by [Diaz Fritz's] own actions or conduct. Specifically, [Diaz Fritz] failed to provide a waste pond for [Hayward's] work; instructed [Hayward] to push back spoils on the site; and failed to adequately monitor or supervise the overall site conditions, including but not limited to the overall grading and drainage on the Project.

(Doc. # 48-4 at 4).

Hayward also asserted two counterclaims against Diaz Fritz. (Id. at 7-9). Count I alleged that Diaz Fritz breached its obligations under the subcontract by failing to pay Hayward for its work on the hospital, and sought payment of the $290,000.00 allegedly due and owing under the subcontract. Count II sought recovery in quantum meruit for the reasonable value of the labor, services, and materials furnished by Hayward during the hospital project.

Diaz Fritz tendered the responsive pleadings to Westfield and requested a defense in the underlying litigation. (Doc. # 47-4). Westfield denied coverage, asserting that neither the counterclaims nor affirmative defenses implicated the duty to defend. (Id. at 8). Diaz Fritz continued the underlying litigation without a defense from Westfield, eventually proceeding to a jury trial.

Prior to trial, Diaz Fritz and Hayward stipulated that (1) Hayward performed all construction work under the subcontract, and (2) the contract price was $290,000.00. (Doc. # 52-1 at ¶ 7; Doc. # 48-5 at 2). Accordingly, the state court instructed the jury that it must accept the following fact as true:

> Hayward [] is entitled to $290,000.00 for the work it performed under the [Diaz Fritz/Hayward subcontract], subject to any offset for damages Hayward [] is held liable for relating to the [property] damage to the hospital.

(Doc. # 48-5 at 2).

The parties also stipulated as to the total amount of property damage to the hospital. (Id.). The jury was therefore directed to accept as true that Diaz Fritz paid $471,601.16 for water intrusion damage to the hospital, $11,680.50 to clean grout from a storm water vault, and $22,316.06 to repair a sewer line. (Id.).

5

The jury instructions continued:

> Each party has a claim. Hayward [] has a claim against [Diaz Fritz] for the balance of money it is owed for work performed under the parties' Subcontract. [Diaz Fritz] has a claim against Hayward [] for the difference between what [Diaz Fritz] spent to fix the damages to the hospital and the amount that Hayward [] otherwise would have been paid pursuant to the Subcontract.

(Id. at 3).

As far as damages, the court told the jury that Hayward sought "the full amount it claims is owed on the Subcontract, $290,000." (Id. at 4). Diaz Fritz, on the other hand, "assert[ed] that its cost of correcting the [aforementioned, stipulated] damage . . . was more than the amount of money that Hayward [] otherwise would have been paid under the Subcontract." (Id. at 3). Therefore, Diaz Fritz sought damages against Hayward for the cost of remediating the water intrusion ($471,601.16), repairing the sewer line ($22,316.06), and cleaning the grout from the storm water vault ($11,680.50), "less [the] $290,000.00" that it owed Hayward for the completed subcontract. (Id.).

Accordingly, during deliberations the special verdict form asked the jury the following questions:

> (1)  Is [Hayward] responsible for the damage caused by the water intrusion into the hospital?

- If you said "Yes", in what amount is [Hayward] responsible? . . . The parties agree that the total cost paid for this damage by [Diaz Fritz] was $471,601.

(2) Is [Hayward] responsible for damaging the sanitary sewer line?

- If you said "Yes", in what amount is [Hayward] responsible? . . . The parties agree that the total cost paid for this damage by [Diaz Fritz] was $22,316.

(3) Is [Hayward] responsible for the grout getting into the storm water vault?

- If you said "Yes", in what amount is [Hayward] responsible? . . . The parties agree that the total cost paid for this damage by [Diaz Fritz] was $11,680.50.

(Doc. # 47-6). The jury answered "yes" to all three questions and found that Hayward was responsible for a total of $263,956.75 worth of damage. (Id.).

Subtracting this figure (and an additional $2,639.57 for Diaz Fritz's lost overhead and profit) from the $290,000.00 contract amount, the jury arrived at a net award of $23,403.68 in favor of Hayward. (Id.). On September 26, 2018, the trial court entered a final judgment in favor of Hayward in the amount of $361,902.44. (Doc. # 47-7).

**C.   The Instant Action**

Due to Westfield's denial of coverage and decision not to defend or indemnify the underlying litigation, Diaz Fritz

initiated the present action in state court on March 11, 2020. (Doc. # 1-1 at 5). The four-count complaint requested a declaratory judgment that Westfield was obligated to defend Diaz Fritz in the underlying litigation and indemnify the final judgment (Count I); alleged that Westfield breached the insurance policy by wrongfully refusing to defend and indemnify Diaz Fritz in the underlying action (Count II); and sought damages under Florida law for bad faith (Counts III and IV). (Id. at 8-14).

Westfield removed the case to federal court on April 3, 2020. (Doc. # 1). On April 17, 2020, Westfield moved to dismiss Counts I, III, and IV. (Doc. # 8). The Court granted the motion and dismissed all counts except Count II, the breach of contract claim. (Doc. # 27).

Discovery has now closed and both parties move for summary judgment. (Doc. ## 47, 48). Both parties have responded (Doc. ## 49, 52) and replied. (Doc. ## 53, 57). The Motions are ripe for review.

## II.  **Legal Standard**

Summary Judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to

defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324).

"Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts." Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung, 695 F.2d 1294, 1296 (11th Cir. 1983). If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)).

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538–

39 (5th Cir. 2004); <u>see also United States v. Oakley</u>, 744 F.2d 1553, 1555 (11th Cir. 1984) ("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed . . . ." (quotation omitted)).

### III. <u>Analysis</u>

Westfield moves for summary judgment on the breach of contract claim, requesting the Court find that "there was no duty to defend or indemnify Diaz Fritz with respect to the underl[y]ing Lawsuit." (Doc. # 48 at 14). Diaz Fritz also seeks summary judgment, asking the Court to "find[] that Westfield breached its duty to defend [Diaz Fritz] in the underlying litigation." (Doc. # 47 at 14). The Court will examine each Motion in turn.

#### A. <u>Westfield's Motion</u>

Westfield argues that summary judgment is appropriate because the defense asserted by Hayward "is not an affirmative claim for relief or 'suit' that would give rise to coverage under the subject policy." (Doc. # 48 at 11).

Diaz Fritz responds that when Hayward's affirmative defenses and counterclaim are read in their totality, "it was clear [Hayward] alleged it was entitled to the full amount of

the sums owed under the Subcontract 'because of' [Diaz Fritz's] liability for [the hospital's] property damage." (Doc. # 52 at 15). Therefore, according to Diaz Fritz, the pleadings as a whole "constitute a 'suit' under the terms of the Policy, . . . triggering Westfield's duty to defend." (Id. at 14).

The Court agrees with Westfield that under the policy, it had no duty to defend or indemnify Diaz Fritz in the underlying litigation.

Both parties have briefed this matter under Florida law. (Doc. # 47 at 7-8; Doc. # 52 at 7). Considering the policy was issued to a Florida insured, and the underlying litigation occurred in Florida state court, the Court agrees that Florida contract law governs the case. See Trans Caribbean Lines, Inc. v. Tracor Marine, Inc., 748 F.2d 568, 570 (11th Cir. 1984) (holding that "Florida applies its own laws to interpret policies which are purchased and delivered in that state"); Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1059 (11th Cir. 2007) (noting that generally, the lex locus contractus of an insurance policy is the state where the insured executed the insurance application).

Florida law requires that the plain and unambiguous language of the policy controls. Swire Pac. Holdings, Inc. v.

12

Zurich Ins. Co., 845 So. 2d 161, 165 (Fla. 2003). Only if the language is susceptible to more than one reasonable interpretation, "one providing coverage and the other limiting coverage," will the court resolve the ambiguity, construing the policy to provide coverage. Interline Brands, Inc. v. Chartis Specialty Ins. Co., 749 F.3d 962, 965 (11th Cir. 2014) (quoting Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co., 913 So. 2d 528, 532 (Fla. 2005)).

There do not appear to be any Florida cases addressing whether an affirmative defense can trigger an insurer's duty to defend. For support, Diaz Fritz primarily relies on Construction Protective Services, Inc. v. TIG Specialty Insurance Co., 29 Cal. 4th 189 (Cal. 2002). (Doc. # 52 at 16). In that case, as here, the plaintiff argued that an affirmative defense constituted a "suit for damages" under its insurance policy, therefore its insurer should have defended it in an underlying lawsuit. Construction Protective Services, 29 Cal. 4th at 194. The trial court disagreed, sustained the insurance company's demurrer, and concluded that an insurer's duty to defend did not extend to affirmative defenses raised in response to a lawsuit initiated by the insured. Id. On appeal, the Supreme Court of California held that the plaintiff adequately pleaded a prima facie right to

13

relief, therefore demurrer was inappropriate and the trial court erred in sustaining it. Id. at 198-99.

Diaz Fritz argues that this case "provides well-reasoned, persuasive authority for establishing coverage for affirmative defenses which do not expose the insured to monetary liability, but would only act to limit the insured's potential recovery." (Doc. # 52 at 16).

Westfield replies that this decision is distinguishable from the instant action (Doc. # 53 at 2), and the Court agrees. In Construction Protective Services, the court specifically noted that the affirmative defense could have been filed as an independent complaint. 29 Cal. 4th at 198 (explaining that "if [the claim for fire damages had been] asserted in a court of law, [it] would unquestionably have been a suit for damages"). But since litigation was already ongoing, the party "was able to assert its . . . damages claim by way of setoff rather than a separate complaint." Id. at 194. This "procedural nuance" meant that the claim "happened" to be filed as an affirmative defense, but "[f]or accounting purposes . . . the effect was no less a monetary recovery than would be a damages award." Id. at 198.

Here, in contrast, Hayward had no viable property damage claim against Diaz Fritz. All purported flood damage was

suffered by the hospital. (Doc. # 48-5 at 2) (informing the jury that "[t]his lawsuit exists because [Diaz Fritz] contends that while Hayward [] was on [the hospital] site working, it caused damage to [the hospital] that [it] did not repair"). Therefore, unlike the party in Construction Protective Services, Hayward could only blame Diaz Fritz for property damage in a defensive capacity, as part of a strategy to offset its own liability. Since Hayward had no independent claim against Diaz Fritz based on property damage, the Court agrees that Construction Protective Service's holding is inapposite.

Furthermore, even if the scenarios were identical, the Construction Protective Service court did not definitively rule on whether the affirmative defense was a suit for purposes of the disputed policy. 29 Cal. 4th at 198. On the contrary, the court "decline[d] to decide this question" as it did not have the "precise terms of the insurance policy . . . before [it]." Id. The Supreme Court of California merely held that, under its Code of Civil Procedure, the trial court should not have sustained the demurrer. Id.

Therefore, Diaz Fritz fails to cite any authority squarely holding that an argument pled as an affirmative defense can trigger the duty to defend.

15

In contrast, Westfield cites several opinions where the court came to the opposite conclusion. (Doc. # 48 at 11). State courts in New York and Massachusetts have unambiguously held that an insurer's duty to defend is not implicated by an affirmative defense. See P.J.P. Mech. Corp. v. Com. & Indus. Ins. Co., 65 A.D.3d 195, 201 (N.Y. App. Div. 1st Dept. 2009) (declining to follow Construction Protective Service and emphasizing the distinction between using an argument "defensively (as in an affirmative defense) [versus] offensively (as in a counterclaim)"); Peckham v. Hanover Ins. Co., No. 0900447, 2010 WL 4070415, at *2 (Mass. Super. July 27, 2010) (finding that the term "lawsuit" can "only be read to describe circumstances in which a party brings a legal action against [the plaintiff]," and holding that "[the plaintiff's] argument that [an] affirmative defense to [the plaintiff's] lawsuit is tantamount to the commencement of a lawsuit against [the plaintiff], and thus capable of triggering [its insurer's] duty to defend [the plaintiff], is illogical and defies a rational reading of the caselaw to which [the plaintiff] cites").

Federal courts have issued similar holdings. In Philadelphia Indemnity Insurance Co. v. Chicago Title Insurance Co., the Seventh Circuit highlighted the

16

differences between and affirmative defense and a counterclaim, stressing that "[a] counterclaim is used when seeking affirmative relief, while an answer or affirmative defense seeks to defeat a plaintiff's claim." 771 F.3d 391, 401–02 (7th Cir. 2014) (internal citation omitted). Accordingly, the Seventh Circuit held that a counterclaim may trigger an insurer's duty to defend, but that same policy "doesn't require [an insurer] to 'defend' against affirmative defenses." Id. at

The district court in Yarbrough v. First American Title Insurance Company likewise held that an affirmative defense was not a "suit" triggering the duty to defend because it did not "raise a potential of liability for [the plaintiff] in the underlying litigation." No. 3:14-CV-01453-BR, 2015 WL 7451193, *6 (D. Or. Nov. 23, 2015). Citing Philadelphia Indemnity Insurance Co., the court held that "[a]bsent language to the contrary in the insurance contract, under normal circumstances an insurer's duty to defend an insured is not implicated when the insured is a plaintiff in an action in which a defendant pleads an affirmative defense that relates to subject matter that may otherwise fall within the scope of coverage." Id. at *5.

This Court comes to the same conclusion, and finds that the underlying litigation did not implicate Westview's duty to defend. Hayward's third affirmative defense "alleged . . . 'property damage'" in the sense that it blamed Diaz Fritz for any purported damage to the hospital. (Doc. # 48-4 at 4; Doc. # 1-1 at 97). But it did not seek any affirmative relief from Diaz Fritz "because of" this damage.

Quite the opposite, the purpose of the defense was to avoid damages under Diaz Fritz's breach of contract claim. By its very nature, a claim pleaded as an affirmative defense (rather than a counterclaim) is limited to a reduction in the plaintiff's damages. See Moore v. State Farm Mut. Auto. Ins. Co., 520 F. Supp. 2d 815, 825 (E.D. La. May 4, 2007) (noting that by pleading a claim "as an affirmative defense in its answer," instead of a counterclaim, "the [defendant] has limited its relief . . . to a reduction of the Plaintiffs' damages").

Therefore, even if successful, the affirmative defense would not have "legally obligated" Diaz Fritz to pay anything. See Id. at 825-26 (holding that an affirmative defense did not trigger coverage under a duty to defend policy, noting that "[the plaintiffs] cannot 'become legally obligated to pay' damages by virtue of [a] set-off affirmative defense, []

therefore [] this affirmative defense does not trigger coverage under the policy"). At most, it would have entitled Hayward to a setoff in damages equal to, but not more than, the amount of Diaz Fritz's claims. Id.

Thus, Hayward's allegations of property damage never "raise[d] a potential of liability for [Diaz Fritz] in the underlying litigation." Yarbrough, 2015 WL 7451193 at *6. Accordingly, the affirmative defense falls outside the policy language, as it is not a civil proceeding alleging damages against Diaz Fritz at all, much less damages "because of . . . 'property damage.'" (Doc. # 1-1 at 111).

Nor did the counterclaims trigger the duty to defend. Neither counterclaim sought reimbursement for property damage to the hospital. (Doc. # 48-4 at 7-9). Instead, both counts alleged purely economic damages stemming from breach of the subcontract. (Id.). Counterclaims initiated purely "for the recovery of money" are not covered by Westfield's general liability insurance policy, which unambiguously required damages "because of" property damage. See, e.g., Key Custom Homes, Inc. v. Mid-Continent Cas. Co., 450 F. Supp. 2d 1311, 1317-18 (M.D. Fla. Aug. 24, 2006) (holding that "[u]nder the law of Florida, general liability policies . . . clearly do

not cover damages that are purely economic in nature," and listing cases).

The Court therefore agrees with Westfield that, even when the responsive pleading is read in its totality, neither the counterclaims nor the affirmative defenses implicated the duty to defend.

The Court is not persuaded by Diaz Fritz's argument that "liability for property damages was the only disputed issue submitted to the jury," therefore "a portion of [Hayward's] judgment against [Diaz Fritz] is 'because of' the property damage which the jury determined [Diaz Fritz] caused to [the hospital]." (Doc. # 57 at 6).

True, property damage to the hospital led Diaz Fritz to initiate suit against Hayward, which in turn led to Hayward's counterclaim, which led to a jury verdict in favor of Hayward. This verdict eventually resulted in a final judgment of $361,902.44 against Diaz Fritz. (Doc. # 47-7). So, in the grand scheme of things, the final judgment was catalyzed by, or "because of," property damage to the hospital.

But the policy is clear that it does not cover every suit that alludes to or tangentially involves property damage. The policy only covers "sums that the insured becomes legally obligated to **pay as damages because of** . . . **'property**

20

**damage,'"** as well as suits "seeking those damages." (Doc. # 1-1 at 97).

Here, although Hayward alleged that Diaz Fritz caused the hospital to flood, Hayward was not seeking relief **because of** this property damage. Indeed, as stated previously, it could not, as only the hospital sustained property damage from the flooding. Therefore, Diaz Fritz was never in danger of being found liable to Hayward for "damages because of . . . 'property damage,'" as unambiguously required by the policy. (Doc. # 1-1 at 97).

The jury instructions confirm that Hayward's counterclaims only sought economic relief "for the balance of money it is owed for work performed under the parties' Subcontract," not reimbursement for any property damage. (Doc. # 48-5 at 3).

While the jury did deliberate on the fault of the alleged property damage, it did so in a narrow context: to determine whether Hayward's economic damages should be offset. Specifically, the jury instructions explained that Hayward's breach of subcontract claim was "subject to any offset for damages Hayward [] is held liable for relating to the [property] damage to the hospital." (Doc. # 48-5). To determine how much of an offset was appropriate, the special

verdict form asked the jury to (1) determine whether Hayward was responsible for the damage to the hospital, and (2) if so, "in what amount[?]"

Once calculated, the form directed the jury to offset this amount against $290,000.00, which was the amount Diaz Fritz owed Hayward under the subcontract (as stipulated by the parties). Following these instructions, the jury found Hayward to be at fault for half of the hospital's property damage, and therefore only entitled to $23,403.68 of its completed subcontract.

Such a verdict touches on property damage, but it should not be confused with a finding that Diaz Fritz was liable to Hayward **for** property damages. At all times in the underlying litigation, Diaz Fritz's potential liability sprang solely from its decision to withhold payment under the subcontract. This scenario does not fall within the language of the policy, even if the counterclaim can be traced back to alleged property damage. See Key Custom Homes, 450 F. Supp. 2d at 1318 (finding a breach of contract claim to allege "purely economic damages," even thought it could be "traced" back to property damage, because the breach of contract claim had a separate and independent basis in common law, therefore it would exist "regardless of the loss of property").

22

In sum, the Court agrees with the greater weight of authority that Hayward's affirmative defense did not trigger Westfield's duty to defend. Hayward never sought recovery from Diaz Fritz for damages "because of" property damage. It only alleged economic damages because of a broken subcontract, and filed a counterclaim seeking those economic damages. Such a "suit" falls outside the plain language of the insurance agreement, therefore Westfield had no duty to defend Diaz Fritz based on the responsive pleading.

"As the duty to defend is broader than the duty to indemnify, if a court determines there is no duty to defend, as a matter of law there cannot be a duty to indemnify." Geovea Specialty Ins. Co. v. Hutchins, 831 F.Supp.2d 1306, 1311-1312 (M.D. Fla. Dec. 21, 2011) (citation omitted). The underlying litigation did not trigger a duty to defend, therefore, as a matter of law, Westfield had no obligation to indemnify the final judgment against Diaz Fritz. Id.

As Westfield had no duty to defend or indemnify Diaz Fritz in the underlying litigation, summary judgment in its favor on Count II is appropriate.

**B.   Diaz Fritz's Motion**

The court has already found that summary judgment in Westfield's favor is appropriate, therefore Diaz Fritz's Motion is denied.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Plaintiff Diaz Fritz Group, Inc.'s Motion for Partial Summary Judgment (Doc. # 47) is **DENIED.**

(2)   Defendant Westfield Insurance Company's Motion for Summary Judgment (Doc. # 48) is **GRANTED.**

(3)   The Clerk is to enter judgment in favor of Westfield and against Diaz Fritz, and thereafter close this case.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 26th day of March, 2021.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE